IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | | |
|---|---|---|
| Lucinda Gardner, on behalf of Linda B. Wynn, deceased, | ) | Civil Action No. 6:16-959-RMG-KFM |
| | ) | |
| Plaintiff, | ) | **REPORT OF MAGISTRATE JUDGE** |
| | ) | |
| v. | ) | |
| | ) | |
| Nancy A. Berryhill, Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

      This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

      The plaintiff, Lucinda Gardner, brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. §§ 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying the claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act of her sister, Linda B. Wynn ("the claimant").[2]

---

[1] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

[2] The claimant died on November 15, 2015 (Tr. 371), and the plaintiff was appointed as a substitute party.

**<u>ADMINISTRATIVE PROCEEDINGS</u>**

The claimant filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits on September 21, 2012, and May 25, 2012, respectively, alleging she became unable to work on December 13, 2008. The alleged onset date was later amended to August 13, 2011 (Tr. 50). The applications were denied initially and upon reconsideration by the Social Security Administration. On April 9, 2013, the claimant requested a hearing. The administrative law judge ("ALJ"), before whom the claimant; her attorney; her sister Lucinda Gardner, who is the plaintiff here; and Tonetta Watson-Coleman, an impartial vocational expert, appeared on June 16, 2014, considered the case *de novo*, and on August 4, 2014, found that the claimant was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied review on January 27, 2016. The plaintiff then filed this action for judicial review on behalf of her sister, who passed away on November 15, 2015 (Tr. 371).[3]

In making the determination that the claimant is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

---

[3] The complaint states that the plaintiff seeks review of the Commissioner's denial of the claimant's DIB and SSI claims (doc. 1 at 2). However, in her brief, the plaintiff acknowledges that the Appeals Council properly dismissed the request for review as to the SSI claim, because SSI claims cannot be continued on behalf of a deceased claimant for whom there is no survivor who may be paid benefits under the regulations (doc. 15 at 2 n.2; *see* Tr. 2-3). *See* 20 C.F.R. § 416.1471(b) (providing that Appeals Council may dismiss a request for review where the claimant dies and there is no information that a survivor exists who may be paid benefits); *id.* § 416.542(b) (defining survivor who may be paid benefits as a qualifying spouse or qualifying parent). Accordingly, it appears that the plaintiff seeks judicial review only as to the denial of the DIB claim.

(1)     The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.

(2)     The claimant has not engaged in substantial gainful activity since August 13, 2011, the amended alleged onset date (20 C.F.R. §§ 404.1571 *et seq.* and 416.971 *et seq.*).

(3)     The claimant has the following severe impairments: status post right ankle surgery, obesity, depression, and anxiety (20 C.F.R. §§ 404.1520(c) and 416.920(c)).

(4)     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

(5)     After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform less than the full range of medium work as defined in 20 C.F.R. §§ 404.1567(c) and 416.967(c). Specifically, the claimant can lift and carry up to 50 pounds occasionally and 25 pounds frequently.  She can sit for 6 hours in an 8-hour workday and stand and/or walk for 6 hours in an 8-hour workday.  The claimant is unable to perform work in close proximity with coworkers, and she is limited to no more than frequent public interaction.

(6)     The claimant is unable to perform any past relevant work (20 C.F.R. §§ 404.1565 and 416.965).

(7)     The claimant was born on July 24, 1952, and was 56 years old, which is defined as an individual of advanced age, on the alleged disability onset date.[4]  The claimant subsequently changed age category to closely approaching retirement age (20 C.F.R. §§ 404.1563 and 416.963).

(8)     The claimant has a high school education and is able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964).

---

[4] This statement is erroneous as the claimant was 59 years old on the amended alleged onset date (August 13, 2011).  The ALJ was apparently referring to the claimant's age as of the original disability onset date (December 13, 2008). However, the ALJ's statement of the relevant age categories was correct.

(9)    Transferability of job skills is not material to the determination of disability because the Medical-Vocational Rules support a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

(10)    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569, 404.1569(a), 416.969, and 416.969(a)).

(11)    The claimant has not been under a disability, as defined in the Social Security Act, from August 13, 2011, through the date of this decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged

4

in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. § 404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* § 404.1520(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id*.

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by

substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## **MEDICAL EVIDENCE**

The claimant was 59 years old on the amended alleged onset date of disability and was 62 years old on the date of the ALJ's decision (Tr. 40-42). She graduated from high school and has past relevant work as a customer service representative, order clerk, answering service operator, and teller (Tr. 40, 50).

The claimant had right ankle surgery in 2003, eight years before her amended alleged onset date of disability (Tr. 341).

On September 29, 2009, the claimant presented to Mark McClain, Ph.D., for a mental status exam at the request of the state agency in connection with her previous

applications for benefits (Tr. 308-11).[5] She reported that she had been fired from her last job at a heating and air company because she "didn't handle customers well." She stated she got anxious and had trouble concentrating, became tired, and got upset easily. She had been unable to find another job. She was easily fatigued and her legs frequently gave out, and this caused problems for the majority of jobs for which she would be qualified. She could take care of her personal needs and daily living activities independently. Dr. McClain's mental status examination revealed normal findings, including good attention and no presence of cognitive impairment (Tr. 309-10). Dr. McClain noted that she was able to understand and follow simple directions during the evaluation. She had no problems with reading, writing, or arithmetic skills. Dr. McClain further noted that the claimant reported suffering from moderate to significant symptoms of anxiety on a consistent basis. She experienced panic attacks as frequently as once per week. Dr. McClain diagnosed generalized anxiety disorder, panic disorder, and dysthymic disorder, and assessed a Global Assessment of Functioning ("GAF") score of 65 (Tr. 310).[6]

---

[5] The claimant was previously denied benefits in an ALJ decision dated August 12, 2011 (Tr. 73-87).

[6] A GAF score is a number between 1 and 100 that measures "the clinician's judgment of the individual's overall level of functioning." *See* Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (Text Revision 4th ed. 2000) ("*DSM-IV*"). A GAF score between 61 and 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well. *Id.* The court notes that the fifth edition of the DSM, published in 2013, has discontinued use of the GAF for several reasons, including "its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice." *See* Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 16 (5th ed. 2013) ("*DSM–V*").

On May 17, 2011, the claimant complained to Perry Trouche, M.D., of Charleston Psychiatry, of anxiety and depression not helped by medications. Dr. Trouche prescribed Venlafaxine ER, Ativan, and Trazadone (Tr. 316). The claimant returned to Dr. Trouche on November 15, 2011, with complaints of anxiety, depression, leg pain, financial stress, and lack of desire to do anything. Dr. Trouche described her mood as anxious, depressed, and frustrated. He diagnosed dysthymia and prescribed Effexor, Ativan, and Trazadone (Tr. 313-14). Attention was good during the evaluation. The claimant had a restricted affect with dysphoric mood. The claimant reported feeling depressed daily since 1998. She endorsed decreased appetite, sleep problems, ruminative thoughts, withdrawal behavior, loss of interest, fatigue, feelings of helplessness and hopelessness (Tr. 313, 318, 320-21). The claimant reported that her medications helped or were tolerable (Tr. 313, 316, 318, 320-21). She followed up in July 2012 with continued anxious mood (Tr. 318).

On July 26, 2012, state agency expert, Michael Neboschick, Ph.D., concluded that the claimant was not disabled. In explaining that the claimant's mental condition did not cause any significant limitations in her ability to perform work related tasks, Dr. Neboschick cited the claimant's unremarkable mental status examination findings, her demonstrated ability to handle chores, shop on the internet, socialize with family, and her report to Dr. McClain that her mental condition was caused by her financial situation (Tr. 91-94; *see* Tr. 316).

On October 24, 2012, Dr. Trouche completed a psychiatric questionnaire. He stated that the claimant had been a patient since May 1999 and had been diagnosed with

dysthymia and chronic depression. Her prognosis was poor with a GAF of 50.[7] Dr. Trouche indicated her diagnosis was supported by sleep disturbance, mood disturbance, anhedonia or pervasive loss of interest, psychomotor agitation or retardation, social withdrawal or isolation, decreased energy, and generalized persistent anxiety. Her primary symptoms were depression, anxiety, decreased concentration, social anxiety and avoidance, and sleep disturbance. He stated that the claimant was markedly limited with maintaining attention and concentration for extended periods, performing activities within a schedule, maintaining regular attendance, being punctual within customary tolerance, sustaining ordinary routine without supervision, working in coordination with or close to others without being distracted by them, and setting realistic goals or making plans independently. He noted that the claimant decompensated in work or work-like settings that caused her to withdraw from the situation and/or experience exacerbation of signs and symptoms. He further noted that worsening back pain exacerbated her psychiatric condition. She was also not able to tolerate even "low stress." Dr. Trouche noted the claimant was not considered to be a malingerer. He expected her impairments to last at least 12 months. Dr. Trouche opined the claimant would miss work more than three times a month. He stated that the earliest date that description of symptoms and limitations in questionnaire applied to was December 13, 2008 (Tr. 324-31). The same day, Dr. Trouche noted the claimant's mood and affect were anxious and depressed (Tr. 320-21).

---

[7] A GAF score between 41 and 50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning. *See* Am. Psychiatric Ass'n, *DSM-IV*, 32-34 (Text Revision 4th ed. 2000).

The claimant returned to Dr. Trouche on January 24, 2013, with complaints of anxiety. She had a euthymic mood, good judgment and insight, no memory impairment, and normal psychomotor behavior. The claimant also reported that her medications worked "ok" (Tr. 333).

On February 27, 2013, Adebola Rojugbokan, M.D., examined the claimant at the request of the Commissioner due to complaints of migraines, high blood pressure, fatigue, and insomnia. The claimant reported that she could not work due to her depression. Physical exam was unremarkable save for some limitation of motion and pain in the right ankle. The claimant had a normal ability to stand, sit, move about, lift/carry heavy objects, and handle objects. Upon review of her musculoskeletal condition, the claimant denied any muscle or joint stiffness, limitations in range of motion, weakness, or tenderness. Physical examination revealed the claimant had a marked decrease in range of her right ankle motion in the dorsiflexion and palmar flexion, but otherwise normal findings, including normal neurological findings. Dr. Rojugbokan's examination findings also included that the claimant had normal sensation and deep tendon reflexes, walked with a normal gait, and did not have any kind of ambulation or assistive device. Dr. Rojugbokan's diagnoses included depression, insomnia, fatigue, hypertension, status post right ankle surgery, migraine headaches, and obesity. He noted she had some difficulty walking (Tr. 334-38).

On March 6, 2013, state agency psychological expert Camilla Tezza, Ph.D., concluded that the claimant was not disabled. Dr. Tezza specifically opined that the claimant could perform simple repetitive tasks without special supervision and was best suited for a job that did not require continuous interaction with the general public (Tr. 116).

She was also persuaded by the reports of the claimant's treating psychiatrist, Dr. Trouche, that her medications controlled the claimant's anxiety symptoms and her mood was euthymic (Tr. 111). On March 8, 2013, state agency examiner, Cleve Hutson, M.D., also concluded that the claimant was not disabled (Tr. 114-18)

From April 2013 to April 2014, the claimant received treatment at North Charleston Internal Medicine for management of her diabetes and hypothyroidism (Tr. 346-70). The claimant re-established care with primary care provider Irwin G. Linton, M.D., on April 1, 2013 (Tr. 346-49). She presented with a six-month history of polyuria, fatigue, and labile hypertension. She complained of problems with intermittent visual disturbance, elevated blood sugars, and bilateral foot numbness. She reported she was unable to work due to severity of depression and more recent medical problems. Her glucose was 267. Dr. Linton assessed diabetes mellitus type 2, hypothyroidism, and depression. She continued followup with Dr. Linton through April 2014 (Tr. 350-60). The claimant reported joint stiffness at the first visit on April 1, 2013 (Tr. 347), but denied joint pain or stiffness at every other visit (Tr. 350, 5/01/13; 353, 7/02/13; 355, 10/03/14; 358, 1/03/14; 360, 4/1/14). At every visit, the claimant's musculoskeletal examination revealed she had full range of motion in all extremities and normal motor strength in all extremities (Tr. 350, 5/01/13; 352, 7/02/13; 355, 10/03/14; 357, 1/03/14; 360, 4/1/14).

On July 24, 2013, Dr. Trouche noted the claimant had an anxious mood but normal psychomotor behavior, no memory impairment, and good judgment and insight. He continued to diagnose dysthymia and anxiety disorder. The claimant again reported that her medications were "OK" despite complaining of anxiety (Tr. 343-44).

The claimant testified at the administrative hearing that she did not like being around crowds. She had difficulty concentrating. Due to her depression, the claimant testified that she slept for 12 hours per day. She took medication, but it did not help much (Tr. 54).In addition to depression, the claimant testified that she suffered from anxiety (Tr. 52). She was irritable and had a difficult time coping with even everyday stressors. Her sister lived across the street and cared for her by cleaning, making meals, and tending to her pets (Tr. 53). She spent much of her day watching television, although she did not really concentrate on what she was watching (Tr. 59).

The claimant testified that she did not feel she could go back to full time work because "I don't think I'd find a company that would be willing to hire me and then me tell them, well, I need three days a week off" (Tr. 55). She described difficulty with supervisors, coworkers, and customers (Tr. 55-56). She had trouble with ruminating and had poor memory and concentration (Tr. 57).

The claimant's sister, Lucinda Gardner, who is the plaintiff here, testified that she lived next door to her sister and saw her every day (Tr. 61). She helped cook, clean, and care for her pets. On days that the claimant was "down," she had no energy and would not do any kind of chores. This happened about three days per week (Tr. 62). Ms. Gardner confirmed that her sister did not like crowds. Ms. Gardner did not feel that the claimant could return to work because she had spells of dizziness and confusion, "especially in an office or place where there's a lot of confusion going on" (TR 63). She felt most of the claimant's symptoms were due to depression. The claimant's mental state had deteriorated significantly over the past few years as family members had moved away; "the great nieces

and nephews were, when they were here, very important to her. It kind of kept her on an even keel" (Tr. 65).

The vocational expert testified that the claimant had past relevant work as a customer service representative, customer service order clerk, answering service operator, telemarketer, and credit authorizer. All were sedentary, semi-skilled positions. The ALJ described a hypothetical worker of the claimant's age, education, and work experience who could perform medium work but was restricted from any work involving close proximity with coworkers and was limited to frequent interaction with the public. The vocational expert testified that this would eliminate past work, but identified other unskilled medium work compatible with such restrictions. If the worker were absent three days per month, this would eliminate all work. If she were off task for 20 percent of the workday, this would eliminate all work (Tr. 67-71).

## ANALYSIS

The plaintiff argues that the ALJ erred by (1) failing to make a proper residual functional capacity ("RFC") determination and (2) failing to properly analyze the opinions of the claimant's treating physicians (doc. 15 at 7-12). As the issues presented are related, they will be analyzed together.

Social Security Ruling ("SSR") 96-8p provides in pertinent part:

The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraph (b), (c), and (d) of 20 C.F.R. §§ 404.1545 and 416.945. Only after that may RFC be expressed in terms of the exertional level of work, sedentary, light, medium, heavy and very heavy.

13

SSR 96-8p, 1996 WL 374184, at *1.  The ruling further provides:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).  In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record.  The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

*Id.* at *7 (footnote omitted).  Further, "[t]he RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.*  Moreover, "[t]he RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."  *Id.*

The regulations require that all medical opinions in a case be considered and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list: (1) the examining relationship; (2) the length of the treatment relationship and the frequency of the examinations; (3)  the nature and extent of the treatment relationship; (4)  the evidence with which the physician supports his opinion; (5) the consistency of the opinion; and (6)  whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. § 404.1527(b), (c)(1)-(6). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005). The opinion of a treating physician is entitled

to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. § 404.1527(c)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4ᵗʰ Cir. 2001).

The plaintiff first argues that the ALJ erred in failing to perform a function-by-function assessment of the claimant's RFC (doc. 15 at 7-8). When assessing RFC in terms of physical ability, an ALJ should assess the claimant's ability to sit, stand, walk, lift, carry, push, pull, or other physical functions (including manipulative or postural functions), as appropriate. 20 C.F.R. § 404.1545(b). Here, the ALJ specified the extent to which the claimant could stand and/or walk (six hours) and sit (six hours) in an eight-hour workday and the maximum weight that she could lift or carry (50 pounds occasionally and 25 pounds frequently) (Tr. 36). As argued by the Commissioner (doc. 17 at 12), the only functional ability listed in the regulation that the ALJ does not explicitly reference is pushing and pulling. However, the plaintiff does not assert and the record does not contain evidence any issue regarding the claimant's ability to push and pull. Additionally, the RFC finding does not contain nonexertional limitations related to postural activities because the ALJ explained that there was no support in the record for a finding that the claimant could not perform the same more than frequently (Tr. 40). The plaintiff has not raised any issue with regard to this finding. Based upon the foregoing, the undersigned finds that the ALJ did not err in failing to perform a function-by-function assessment as alleged by the plaintiff.

The plaintiff next argues that the ALJ's findings as to the claimant's standing, walking, lifting, and carrying limits are not based on substantial evidence (doc. 15 at 8, 12). As noted above, in the RFC assessment, the ALJ found that the claimant had the physical ability to perform medium exertional work, including lifting and carrying up to 50 pounds

occasionally and 25 pounds frequently, sitting for six hours in an eight-hour workday, and standing and/or walking for six hours in an eight-hour workday (Tr. 36). The ALJ stated that he considered the claimant's "history of right ankle surgery in limiting the amount she can lift and carry, [but] there are no gait abnormalities or lower extremity strength deficits to suggest that the claimant is unable to perform the standing and walking requirements of medium level work" (Tr. 37). The ALJ further stated, "Because the physical examinations do not reflect any gait or strength deficits since the claimant's amended alleged onset date, there is no indication that she is unable to perform the standing/walking requirements of light work. Nonetheless, I have considered this impairment in conjunction with her obesity in limiting the amount she can lift and carry" (Tr. 40).[8]

The ALJ's findings as to the claimant's physical abilities are based upon substantial evidence. Specifically, the ALJ cited and relied on the following evidence (Tr. 37-40): despite her history of right ankle surgery, the claimant did not require or receive treatment for her right ankle pain symptoms after her alleged onset date of disability; at a consultative examination in February 2013, the claimant told Dr. Rojugbokan that she could stand, sit, and move around normally, and while the examination revealed she had a marked decrease in right ankle range of motion, she also had intact reflexes and sensation, normal toe-heel walking, and normal gait without the use of an assistive device (Tr. 334-38); in April 2013, the claimant complained of some foot numbness, but she denied significant pain, and examination confirmed she had full range of motion, full strength, normal sensation of all extremities, no edema, clubbing, or cyanosis, and no gait abnormalities

---

[8] The reference to "light work" appears to be a scrivener's error.

were noted (Tr. 346-47); normal examination findings remained constant at the claimant's followup visits in May and July 2013 (Tr. 350, 352); although the claimant reported not feeling well at October 2013 and January 2014 followup visits, she exhibited no abnormalities in her right ankle or any other extremities and had full range of motion and full strength in all extremities with intact sensation (Tr. 355, 357); at her followup visit in April 2014, the claimant again exhibited no right ankle abnormalities (Tr. 360).

The ALJ also considered the claimant's obesity, finding that it did not impose greater limitations than those outlined in the RFC assessment (Tr. 37); however, he limited the amount the claimant could lift and carry in consideration of her obesity and ankle issue (Tr. 37, 40). The ALJ cited the following evidence in support of this finding: the claimant did not report any functional limitations related to her obesity; treatment notes as set forth above showed that she moved about generally well, functioned consistently, and had good muscle tone; and the record did not demonstrate that obesity had complicated her cardiovascular, respiratory, or musculoskeletal body systems (Tr. 37; *see* Tr. 347, 4/03/2013; 350, 5/01/13; 352, 7/02/13; 355, 10/03/14; 357, 1/03/14; 360, 4/1/14).

The plaintiff argues that the ALJ failed to properly consider the statement of consultative examiner Dr. Rojugbokan that the claimant had "some difficulty walking" (doc. 15 at 12; *see* Tr. 338). The undersigned disagrees. The ALJ found that "this statement appears to be solely based on the claimant's subjective complaints, as Dr. Rojugbokan explicitly stated that the claimant ambulated with a normal gait and without an assistive device, and he documented no strength deficits of the lower extremities." Accordingly, he gave the opinion "little weight" (Tr. 39; *see* Tr. 334-38). The plaintiff contends that the ALJ rejected Dr. Rojugbokan's assessment simply because it was based on the claimant's

subjective complaints (doc. 15 at 12). What the ALJ actually stated was that Dr. Rojugbokan's statement that the claimant had "some difficulty walking" appeared to be based upon the claimant's subjective complaints because there was no support for the finding in the examination report (Tr. 39). The ALJ cited Dr. Rojugbokan's contradictory examination finding that the claimant ambulated with a normal gait without using an assistive device and documented no strength deficits (Tr. 39; *see* Tr. 337). In discussing the examination findings, the ALJ acknowledged that Dr. Rojugbokan found that the claimant exhibited marked decrease in the range of motion of her right ankle, but also demonstrated intact reflexes and sensation and normal heel/toe walking (Tr. 37; *see* Tr. 337). As discussed above, the ALJ also cited other examination reports from the claimant's primary care physician, Dr. Linton, showing that she had full range of motion and normal motor strength in all extremities and denied joint pain or stiffness at every visit with the exception of the initial visit in April 2013 (Tr. 37; *see* Tr. 347, 4/03/2013; 350, 5/01/13; 353, 7/02/13; 355, 10/03/14; 358, 1/03/14; 360, 4/1/14). The existence of such contradictory examination findings provides substantial evidence for the ALJ's assignment of only little weight to Dr. Rojugbokan's statement that the claimant had some difficulty walking. *See* 20 C.F.R. § 404.1527(c)(4) (stating that the more consistent a medical opinion is with the record as a whole).

In assessing the claimant's RFC with regard to her mental ability, the ALJ found the claimant was unable to work in close proximity with coworkers and she was limited to no more than frequent public interaction (Tr. 36). In so limiting the claimant, the ALJ specifically relied upon the following evidence (Tr. 37-40): in September 2009, approximately two years prior to the alleged disability onset date, consultative examiner Dr.

McClain reported that the claimant had unremarkable mental status findings, she scored within normal limits on the Folstein Mini-Mental State Examination, and Dr. McClain assessed a GAF scale score that corresponded to mild limitations in functioning (Tr. 309-10); although the claimant received mental health treatment during the relevant period, no significant objective abnormalities were documented; in November 2011, the claimant appeared anxious and frustrated, but she reported that her medications were beneficial and denied delusions, hallucinations, and suicidal thoughts (Tr. 313); at followup visits in July and October 2012, the claimant still appeared anxious, but she reported that her medications were tolerable, and her mental status examinations again yielded unremarkable findings (Tr. 318, 320); in January 2013, treatment notes demonstrated that the claimant benefitted from her prescribed medication, and she again exhibited normal mental status examination findings, including no memory impairment, good judgment and insight, and normal psychomotor behavior, as reported by treating physician Dr. Trouche (Tr. 333); in July 2013, the claimant complained of anxiety, but her unremarkable mental status examination findings remained unchanged, and she reported that her medications helped to control her symptoms (Tr. 343); in October 2013 and January 2014, the claimant reported to Dr. Linton that she was doing generally well and her anxiety was well-controlled on her medications (Tr. 354, 357), and examination revealed no abnormalities at those visits or at a followup visit in April 2014 (Tr. 355, 357, 359); and despite the claimant's report of difficulty concentrating, the record contained no objective examination findings documenting such deficits (Tr. 38).

The plaintiff argues that the ALJ failed to provide adequate reasons to accord "little" weight to treating physician Dr. Trouche's opinion that the claimant was disabled (doc.

15 at 11).  As set forth more fully above, in an October 2012 questionnaire, Dr. Trouche stated the claimant had been diagnosed with dysthymia and chronic depression and her prognosis was poor.  He stated that the claimant was markedly limited in maintaining attention and concentration for extended periods, performing activities within a schedule, maintaining regular attendance, being punctual within customary tolerance, sustaining ordinary routine without supervision, working in coordination with or close to others without being distracted by them, and setting realistic goals or making plans independently.  He noted that the claimant decompensated in work or work-like settings that caused her to withdraw from the situation and/or experience exacerbation of signs and symptoms, and she was incapable of even a "low stress" job (Tr. 324-31).

The ALJ specifically considered Dr. Trouche's opinion and found that it was entitled to "little weight" (Tr. 39).  In doing so, the ALJ explained that he could not adopt Dr. Trouche's opinion because it was inconsistent with his own treatment notes. The ALJ pointed out that the claimant's mental status examinations typically revealed normal findings, with the exception of her mood and affect (Tr. 39; *see* Tr. 313, 318, 320-21, 333, 343). The ALJ also cited Dr. Trouche's reports that the claimant tolerated her psychotropic medications well and stressed that the benign objective findings undermined Dr. Trouche's assessment of marked limitations related to concentration, persistence, and social interaction (Tr. 39). The ALJ was entitled to rely upon these inconsistencies in evaluating Dr. Trouche's questionnaire opinion. *See* 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion."); *id.* §

404.1527(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."). In light of the evidence, the ALJ reasonably accorded only little weight to Dr. Trouche's assessment, and he provided the court the opportunity for meaningful review.

The plaintiff argues that the state agency psychological consultant's findings call into question the claimant's ability to function mentally on a consistent basis (doc. 15 at 8-9). Specifically, the plaintiff cites Dr. Tezza's mental RFC assessment in which she found the claimant was moderately limited in carrying out detailed instructions, maintaining extended attention, adhering to a schedule, being punctual, maintaining regular attendance, avoiding distractions by others, and completing a work week at a consistent pace and without an unreasonable number of rest periods (doc. 15 at 8 (citing Tr. 132)). Dr. Tezza concluded that the claimant would be expected to have difficulty understanding, remembering, and carrying out detailed instructions but was capable of performing simple tasks for at least two hour periods of time, would be expected to occasionally miss a day of work secondary to her symptoms, would have difficulty working in close proximity or coordination with coworkers, would be best suited for a job that did not require continuous interaction with the public, and was capable of single, repetitive tasks without special supervision (Tr. 133). The ALJ specifically considered this opinion but gave little weight to the restriction to simple repetitive tasks based upon lack of objective concentration deficits documented in the record, as set forth in the evidence listed above (Tr. 40). The ALJ gave great weight to the social restrictions and incorporated them into the RFC assessment (Tr. 36, 40). Notably, state agency psychological consultant Dr. Neboschick concluded that the claimant's mental condition did not cause any significant limitations in her ability to perform

work related tasks, based upon unremarkable mental status examination findings, her demonstrated ability to handle chores, shop on the internet, and socialize with family, and her report to Dr. McClain that her mental condition was caused by her financial situation (Tr. 91-94; *see* Tr. 316).

The plaintiff further argues that the ALJ ignored evidence that the claimant was terminated from her job "because she 'didn't handle customers well'" (doc. 15 at 8 (citing Tr. 308)).  However, the ALJ specifically accounted for the claimant's anxiety and reported difficulty being around others by limiting her to no more than frequent interaction with the public and no work in close proximity with coworkers (Tr. 36, 40).

The plaintiff next argues that the ALJ "relied only on a brief mental status examination completed prior to the time period at issue to find that [the claimant] suffered only mild limitations in concentration, persistence, or pace" (doc. 15 at 8 (citing Tr. 35)). The plaintiff's reference is to Dr. McClain's 2009 findings (*see* Tr. 308-11).  At the third step of the sequential evaluation process, the ALJ cited Dr. McClain's examination findings showing the claimant was able to repeat three words immediately after their presentation, repeat five digits forward and four in reverse, and perform serial 7 tasks to seven operations with no mistakes (Tr. 35).  However, he further stated that there was no evidence that the claimant "exhibited any concentration deficits after her amended alleged onset date" (Tr. 35).  In the subsequent section regarding the claimant's RFC, the ALJ again noted Dr. McClain's 2009 findings and then provided a discussion of the unremarkable mental health evidence from the relevant period (Tr. 38). As illustrated above, the ALJ discussed the claimant's treatment notes from the relevant period, specifically Dr. Trouche's notes from November 2011; July and October 2012; January, July, and October 2013; and January and

April 2014, which reflect essentially normal mental status examinations, including no significant memory or concentration deficits, and demonstrate that her depressive and anxiety symptoms were well-controlled by psychotropic medications (Tr. 38-40; *see* Tr. 313, 316, 318, 320-21, 333, 343).

Based upon the foregoing, the undersigned finds that the ALJ relied on and discussed substantial evidence from the relevant period that supports the RFC assessment. *See Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (district court should defer to the Commissioner's findings if they are legally correct and supported by substantial evidence despite the presence of other, arguably contradictory, evidence in the record); *see also Smith v. Chater*, 99 F.3d 635, 638 (4th Cir.1996) ("We must sustain the ALJ's decision, even if we disagree with it, provided the determination is supported by substantial evidence.") (citations omitted).

## CONCLUSION AND RECOMMENDATION

The Commissioner's decision is based upon substantial evidence and is free of legal error. Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

May 10, 2017                                          s/ Kevin F. McDonald
Greenville, South Carolina                           United States Magistrate Judge